## Case No. 13,205.

### SPARHAWK et al. v. RICHARDS et al.

[12 N. B. R. 74; 1 Wkly. Notes Cas. 510.] [1]

Circuit Court, E. D. Pennsylvania. April 24, 1875.

SALE—TRANSFER—FAILURE OF VENDOR—BANKRUPTCY—ACTION BY ASSIGNEE.

The defendants, brokers, purchased from another broker certain shares of stock, the transfer and payment to be made on the next day. On the next day the vendor sent to the vendees a bill of sale of the stock, and notified them thereby that the stock had been or was about to be transferred. Payment was thereupon made by the vendees. The vendor failed later in the day, without having made the transfer, but within a few hours after his failure, upon importunity of the vendees, who had knowledge of his insolvency, he gave to them a certificate of a certain number of the shares agreed to be sold, with power of attorney to make the transfer, and procured a debtor of his to make the transfer of the remainder, which was done within a few days subsequently. The assignees in bankruptcy of the vendor, by a bill in equity, sought to restrain the vendees from transferring or selling the said shares of stock, and to enforce a delivery thereof to the assignees, alleging that the receipt thereof was a preference, and in violation and fraud of the bankrupt act. The court dismissed the bill.

[Cited in Bush v. Boutelle, 156 Mass. 170, 30 N. E. 607.]

[This was a bill in equity by John Sparhawk, George J. Gross, and J. Davis Duffield against Samuel A. Richards and William Richards.]

By F. MASON, Master:

To the Honorable the Judges of the Said Court:

The master appointed in the above entitled suit in equity, respectfully reports: That after due notice, I was attended at my office, No. 131 South Fifth street, Philadelphia, on the 18th day of March, 1874, at one o'clock, p. m., and at other times, by George Junkin. Esq., for the plaintiffs, and Samuel G. Thompson, Esq., for the defendants, by whom arguments were made as to the questions involved in said suit.

[1] [Reprinted from 12 N. B. R. 74, by permission. 1 Wkly. Notes Cas. 510, contains only a partial report.]

The following is a statement of the material facts:

On the 14th day of October, 1871, the defendants, being brokers in the city of Philadelphia, purchased from Charles T. Yerkes, Jr., trading as C. T. Yerkes, Jr. & Co., (also brokers,) of whom the plaintiffs are assignees in bankruptcy, sixty-seven shares of the stock of the Pennsylvania Railroad Company, for the sum of three thousand eight hundred and ten dollars and sixty-three cents. The purchase was what is known among brokers as "regular," the transfer of the stock and the payment therefor to be made on the day succeeding the day upon which the contract is made. The 14th day of October, 1871, was Saturday; consequently the execution of this contract was to be completed on Monday, the 16th day of October, following. About noon on that day the defendants gave to C. T. Yerkes, Jr. & Co. their check on the First National Bank of Philadelphia for the amount of the purchase, upon receiving from said C. T. Yerkes, Jr. & Co. a bill for said stock, in the following form:

"Office of C. T. Yerkes, Jr. & Co.
"20 South Third Street,
"Philadelphia,       16, 1871.
"Sold R. & Thompson,
"————67 Pa————@ 56⅞————$3810.63.
"Transfer'd.        C. T. Yerkes, Jr & Co.,
"Per J. P. Y."

The check was duly paid. Shortly afterwards, on the same day, sometime during the afternoon, Mr. Richards, one of the defendants, went to the office of C. T. Yerkes, Jr. & Co., and inquired whether the stock had been transferred. He was informed that it had not been transferred. What induced the visit of Mr. Richards he does not clearly state, but it is evident that his suspicions had been aroused as to the financial condition of C. T. Yerkes, Jr. & Co., from information he had received at the board of brokers. He then inquired whether C. T. Yerkes, Jr. & Co. had the stock, and was informed that they had not the amount which had been purchased by his firm, but that they had thirty-three shares. For this he demanded the certificate, with a power of attorney to transfer, which was given to him. Subsequently, a few days afterwards, by an arrangement previously made between the firm of Bowen & Fox, who were, on the 16th day of October, indebted to C. T. Yerkes, Jr. & Co., the remaining shares of the sixty-seven were transferred to Richards & Thompson. This arrangement appears to have been made by Mr. Fox, of the firm of Bowen & Fox, with Charles T. Yerkes, Jr., Mr. Fox, hearing of his trouble with Richards & Thompson, volunteering to make the delivery of the stock for him. Bowen & Fox accordingly credited themselves with the amount thus delivered on behalf of C. T. Yerkes, Jr. & Co., in their account subsequently rendered.

C. T. Yerkes, Jr. & Co. failed on the said 16th day of October, 1871, between two and three o'clock in the afternoon, and did not afterwards resume payment. Proceedings in bankruptcy were commenced against them, and, on the 13th day of December following, adjudication of bankruptcy was made, and subsequently the plaintiffs were appointed assignees. The present bill was brought by them to restrain the defendants from transferring or selling the said shares of stock, and to enforce the delivery of the same to the plaintiffs, or, if they have been sold, to obtain an account thereof, the plaintiffs alleging that the receiving and procuring of the said shares of stock by the defendants, under the circumstances narrated, was a procurement of a preference to themselves over the other creditors of the bankrupt, and in direct violation and in fraud of the provisions of the act of congress entitled "An act to establish a uniform system of bankruptcy throughout the United States," approved March 2, 1867 [14 Stat. 517].

The theory of the plaintiffs' bill is, that when the defendants paid the sum stated to C. T. Yerkes, Jr. & Co. upon the faith of the representation that the stock had been transferred, or was about to be then presently transferred to them, they gave a credit to C. T. Yerkes, Jr. & Co., and, upon the failure by the latter to make the transfer, they became merely creditors for the amount which they had paid, and that being such, and having reasonable cause to believe that C. T. Yerkes, Jr. & Co. had become insolvent, their demand for the transfer and subsequent receipt of the stock was a procurement of a preference, as contemplated in the first clause of the 35th section of the bankrupt act—in other words, that the failure of C. T. Yerkes, Jr. & Co. to make the transfer immediately after the payment, was a failure to execute a contract with the defendants, and that before its execution the insolvency of C. T. Yerkes, Jr. & Co. intervened, the existence of which the defendants had reasonable cause to believe, and that, therefore, the insolvent had no right, under the provisions of the act referred to, to fulfill the contract, either directly or indirectly, and the defendants must account for and return that which they received.

It is answered on the part of the defendants that the bill received by them from C. T. Yerkes, Jr. & Co., and their payment of the consideration of the purchase, effected an equitable assignment of the stock, and that although the actual transfer on the books of the railroad company had not then been made, yet the property became vested in the defendants, and that, consequently, the subsequent transfer could not be one obnoxious to the provisions of the act of congress referred to. This position is not destitute of authority to support it, at least as to the thirty-three shares, (see Add. Cont. 204, and the cases there cited,) but I prefer to consider the transaction from another point of view. The contract for the purchase and sale

on the 14th of October, was that on the payment of the money on the 16th, C. T. Yerkes, Jr. & Co. would transfer to the defendants the stock so purchased and sold. No credit was intended to be given by either party to the other. The act of the vendor—the transfer—and the act of the vendee—the payment—were to be synchronous. If the vendor did not transfer the stock, the vendee was not bound to make the payment; and if the vendee did not make the payment, the vendor was not bound to make the transfer. The defendants, therefore, awaited the signification by their vendor of his readiness to do his part, and when the bill referred to was received, it was, according to the custom of brokers, a notification by the vendor that he was then presently ready to make the transfer and would immediately do so. Thereupon the defendants made the payment. The vendor then discovered that he had not a sufficient quantity of this particular stock then in his possession to enable him to fulfill this and other contracts which he had made. His duty was clearly, then, to immediately return the money paid, and if he had done so I do not think it could be contended that his assignees in bankruptcy could recover it from his vendee. If the vendor had said to the vendees, "I cannot do that which I have just told you I was ready to do, and I therefore return that which was given to me upon the faith of my promise of immediate performance of my part of the contract," could it be pretended that the vendees, by its acceptance and rescission of the contract, would receive a preference, though they should be informed at the same time of the insolvency of their vendor? It seems to me that to hold that the clause of the section of the act referred to contemplates such a result and such an application of its provisions, would be a monstrous distortion of the language and intention of congress.

The vendor, however, did not make the tender of return suggested, but, on the same day, gave the defendants a certificate with power of attorney to make the transfer of thirty-three of the shares purchased, and within a few days transferred the remaining shares by availing himself of the offer of a debtor of his to make it for him, crediting the value of the stock on the debt.

Now, was the course of the vendor any more a violation of the provisions of the bankrupt act than the one just supposed? Are the interests of the creditors of the bankrupt any more injuriously affected in the one case than in the other? Can it be that the defendants, who would not have parted with their money unless they had believed that they would immediately receive the stock, and who would have been entitled to receive an immediate return of their money, though their vendor had become insolvent, can be required to give up the stock after the vendor has actually transferred it to them—part of it on the day when he should have done so by the terms of his contract, and the remainder within a day or two subsequently? I think that the clause of the section referred to cannot be construed to apply to transactions with an insolvent, or one about to become so, where, by the terms of the contract, a present adequate consideration is intended to be paid for a present delivery or transfer of property, although the necessities of the ordinary convenient conduct of business may require a trust to be reposed by both parties in each other, and either fails, before his unexpected insolvency occurs, (the knowledge of which is communicated to the other,) to perform his part, but does so shortly afterwards; provided, of course, that the rights of bona fide purchasers for value be not affected. For how can a transfer or payment, under such circumstances, be said to be made with a view to give a preference? Where a credit is intended to be given, though but for a day or an hour, or even a shorter time, if such may be the case, as where that which is to be done is, by a proper construction of the contract, to be performed subsequent to and not simultaneous with the payment of the consideration, then an intention to give a preference, within the meaning of the statute, may be attributed to a performance, after the intervention of insolvency, of one such contract, and not of others of the same nature. Before commencement of proceedings in bankruptcy, but after insolvency, the insolvent may sell his property for a present adequate consideration, because his estate receives value and no diminution thereof takes place. Cook v. Tullis [18 Wall. (85 U. S.) 332.] Can the circumstance that insolvency happens between the payment of the consideration and the delivery of the property, render the transaction less innocent, or one to which creditors can object as an injury to their interests? It is to be observed that I have taken as proved that the defendants, at the time they received the stock, had reasonable cause to believe that C. T. Yerkes, Jr. & Co. were insolvent. The only one of them examined has denied that such was the case, but such denial is evidently to be attributed to his misunderstanding of what, in contemplation of law, is meant by insolvency. To further illustrate the view which I have taken, it has occurred to me that the transaction cannot be distinguished from the purchase of coupon bonds payable to bearer, over the counter of a broker, where, after the money has been handed, and in the instant intervening between its receipt and delivery of the bonds, in consequence of unexpected demands, he becomes insolvent, and the fact is made known to the purchaser. Surely the broker would not be giving a preference to a creditor or person having a claim against him by then delivering the bonds.

I have not been able to find any case in point sustaining the conclusion to which I have arrived; but the doctrine that advances made on the faith of a security presently to

be given will be protected,—notwithstanding changes in the condition of the borrower pending the consummation of the agreement, by actual delivery of the security,—is analogous in principle to the reasoning which I have adopted. See Ex parte Ames [Case No. 323]; In re Perrin [Id. 10,995].

I have not considered the applicability of the second clause of the 35th section of the bankrupt act, because, apart from the question of alleged preference, there is not the slightest evidence that the sale was made out of the ordinary course of the business of the debtor, or with a view to prevent his property from coming into the hands of the assignees, or to defeat or delay the object of the act or impair its operation. I recommend that the bill be dismissed.

Exceptions to master's report:

First. Because the master has reported that there was no preference obtained by the defendants in fraud of the bankrupt law.

Second. Because the master has reported that the defendants should not be required to account for the stock transferred to them by the bankrupt after both he and they were fully aware of his insolvency.

Third. Because the master has reported that the bill should be dismissed.

George Junkin, Solicitor for Plaintiffs.

McKENNAN, Circuit Judge. Upon the above exceptions by the plaintiffs to the master's report, the court confirmed the report and dismissed the bill.